Filed 9/27/21  In re A.M. CA2/5

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re A.M., a Person Coming Under the Juvenile Court Law. | B309090 (Los Angeles County Super. Ct. No. 17CCJP01782C) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. AMANDA M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Akemi Arakaki, Judge.  Affirmed.

Lori Siegel, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, Tracey Dodds, Principal Deputy County Counsel, for Plaintiff and Respondent.

———————————————

## I.    INTRODUCTION

Amanda M., mother of now two-year-old A.M., appeals from the juvenile court's order denying her reunification services with the child.[1]  We affirm.

## II.    BACKGROUND

A.    *Mother's Failure to Reunify with Child's Half Siblings*

On November 14, 2017, the Los Angeles County Department of Children and Family Services (Department) filed a Welfare and Institutions Code section 300[2] petition alleging mother had physically abused the child's older half siblings M.S. and A.M.-S. by striking them with a belt and brush and threatening to smash their heads against a wall.  Mother also struck M.S.'s stomach and arm with her fist.  The petition further alleged mother had mental and emotional problems, failed to

---

[1]    The child's father, R.B., is not a party to this appeal.

[2]    All further statutory references are to the Welfare and Institutions Code.

take her psychiatric medication as prescribed, and had been involuntarily hospitalized on three occasions for the evaluation and treatment of her psychiatric condition. The juvenile court sustained the petition.

At the February 22, 2018, disposition hearing, the juvenile court ordered the Department to provide mother with reunification services including individual counseling that addressed "'mother's lengthy and unresolved history of resistance to consistent mental health and psychiatric and therapeutic treatments[,]' . . . participating in current psychiatric treatment[,] and compliance with [a] prescribed psychotropic medication regimen."

For the 12-month review hearing on January 9, 2019, the Department reported that mother had been referred to all court-ordered services. She had not, however, been able to stabilize her mental health. Between March and May 2018, she had several psychiatric hospitalizations. She had not complied with her mental health services and refused to cooperate with her regional center services. On February 20, 2019, the juvenile court terminated mother's family reunification services due to her noncompliance with her case plan.

On or about June 4, 2019, the Department received a five-day referral stating that mother had failed to reunify with two children and had just given birth to the child. Mother had received limited prenatal care during her pregnancy. She reported that she was homeless and had given up her apartment because she wanted a place safe from father with whom she had a history of domestic violence.

B.    *Dependency Proceedings*

After the child was born, she was placed on respiratory support in the neonatal intensive care unit at the hospital.  On June 5, 2019, the child's doctor informed a social worker that mother had been aggressive, argumentative, and accusatory with the hospital staff.  Mother was placed on a section 5150 hold due to her aggressive behavior.  Mother insisted that she be allowed to take the child "'home'" that day despite being told that the child was not medically ready for discharge.  The doctor indicated that mother and the child might be released from the hospital the next day.  On June 6, 2019, the Department detained the child.

Mother was released from the section 5150 hold on June 8, 2019.  Mother's behavioral discharge summary stated that she "'was very delusional, and was thinking that people were trying to steal [the child].  She made some bizarre comment about how the [l]abor and delivery nurses were molesting [the child].  She is no longer psychotic and has cleared up drastically with her Thorazine and Haldol that she received.'"  Mother was diagnosed with schizoaffective disorder and discharged with no medication.

On June 10, 2019, the Department filed a section 300 petition alleging the child was at risk of harm because mother had physically abused the child's half siblings.  The half siblings were receiving permanent placement services.  The petition further alleged that mother had a history of mental and emotional problems that included a diagnosis of bipolar disorder, schizoaffective disorder, borderline intellectual functioning, depression, psychosis and suicidal ideation, delusional thoughts, paranoid behavior, and being a danger to others.  On five occasions, mother had been hospitalized for the evaluation and

4

treatment of her psychiatric condition, including shortly after the child's birth. Mother failed to take her psychotropic medication as prescribed or to participate regularly in mental health counseling.

At the June 11, 2019, detention hearing, the juvenile court found there were no reasonable means to protect the child without removing her from the parents' physical custody.

In its July 12, 2019, Jurisdiction/Disposition Report, the Department recommended, pursuant to section 361.5, subdivision (b)(10), that mother not receive reunification services.

On July 24, 2019, the Department filed a first amended section 300 petition that included a new count alleging the child was at risk due to father's history of mental and emotional health problems and a new count alleging mother's and father's history of domestic violence placed the child at risk.

In a Supplemental Report filed on July 26, 2019, a social worker reported that mother denied that she had a history of mental and emotional problems, had been diagnosed with several mental health conditions, or had been hospitalized. As to the allegations in the petition, mother stated, "'Not true. None of it. I have proof on paper. I have a doctor's note showing I don't need medication.'"

The social worker asked mother about her recent psychiatric hospitalization. Mother responded, "'My mom didn't want nothing to do with me and she said to go the police and tell them to take care of you, so I did that. My mom disowned me, and now doesn't want nothing to do with me. That tells you what kind of person she is.'"

In an August 16, 2019, Last Minute Information for the Court, the Department reported that during an August 12, 2019,

visit with the child mother "appeared paranoid and seemed to be talking to people that were not there, and cussing and yelling at some imaginary people." The visitation monitor was able to calm down mother, "who then began singing a song to the [child]."

In a December 6, 2019, Last Minute Information for the Court, the Department reported that mother had completed the Skillful Parenting course at El Monte-Rosemead Adult School on October 8, 2019. A dependency investigator contacted the school to determine the nature of the program. According to the receptionist, the program was self-directed and not teacher-directed. The Department did not consider the Skillful Parenting course an appropriate parenting instruction course. Because of mother's significant mental illness, she required a parenting class that included both facilitator-led instruction and group discussion.

On December 3, 2019, mother informed the social worker that she was not attending individual therapy. When the social worker asked mother about her medication compliance, mother stated that she was taking Abilify as her psychiatrist prescribed. The social worker asked to see mother's medication. Mother produced an empty prescription bottle for an Abilify generic that had no lid. The social worker asked why the bottle was empty and mother did not have an answer. The medication was issued on October 23, 2019. The social worker opined that if mother were medication compliant and given a 30-day supply, mother would have run out of medication on or about November 23, 2019.

On December 5, 2019, the social worker spoke with mother's visitation monitor. Among other things, the monitor reported that mother talked to the child "obsessively" during visits—"'She doesn't stop. Her mind wanders. Sometimes she

doesn't make sense or says something that she contradicts in the next sentence. She told me she couldn't stay because she is very busy, then she said she has nothing to do. I'm not a doctor, and I don't know if she's been diagnosed, but she does have some kind of mental illness, in my opinion.'" The monitor opined, "'She really does love the [child], but she is not capable of caring for her.'"

In a January 17, 2020, Last Minute Information for the Court, the Department reported that the social worker provided mother with new parenting class referrals on December 3, 2019. When the social worker asked mother about individual therapy, mother stated she would continue to go at the place where she got her medication. To date, mother had not provided evidence that she had participated in individual counseling or appropriate parenting classes.

At the January 17, 2020, adjudication hearing, the juvenile court sustained the first amended petition as alleged.

In a Last Minute Information for the Court dated February 7, 2020, the Department reported that mother was not compliant with the case plan. On February 5, 2020, mother informed the dependency investigator that she had not started a new parenting class, was not attending individual therapy, and was not taking any medication.

On February 5, 2020, the social worker spoke with mother's visitation monitor. She reported that mother visited the child consistently and was loving and caring toward the child but was not "'cognitively . . . there.'" The monitor had "great concerns" about mother's mental health. During visits, mother displayed "sudden mood changes, impulsivity, paranoia, explosive outbursts of anger directed at . . . father, perserveration, and incessant

7

speech that [was] most often incoherent and tangential." Although mother had never hurt the child, she occasionally displayed age-inappropriate expectations of the child and her development. For example, although the child was not ready for solid food, mother talked about feeding her hamburgers.

In a March 30, 2020, Last Minute Information for the Court, the Department reported that the social worker referred mother to Akoko Nan parenting classes. The social worker had asked mother about her medication and therapy, but mother did not respond. The social worker scheduled two meetings with mother to see her medications, but mother did not show up for the meetings.

In a Last Minute Information for the Court for the continued disposition hearing on September 17, 2020, the Department reported that mother told the social worker that she had finished parenting classes with Vicky Gonzalez at the El Monte Adult School. She was waiting to take additional parenting classes, but everything was closed due to COVID-19. Mother received mental health treatment at the Antelope Valley Mental Health Clinic. Mother stated that she talked to a therapist every month. Mother had an appointment with her psychiatrist in November.

According to the child's caregiver, there had not been a scheduled visit in over a year. Mother occasionally saw the child when the child visited her grandmother and other relatives.

Mother had a baby sometime between June 2019 and September 2020. The social worker spoke with the baby's caregiver. Asked if mother spoke about her mental health or medication, the baby's caregiver responded, "'She says she won't take any medication. She says, "They think I'm crazy, but I'm

8

not crazy.  There's nothing wrong with me."  She talks about the government and the rules they want her to abide by—why does the system take away children when the parents haven't done anything wrong.  She thinks she hasn't done anything wrong—with any of her kids that have been taken away.'"

In a Last Minute Information for the Court filed September 23, 2020, the Department reported that a dependency investigator had spoken with Ms. Gonzalez who confirmed mother's completion of the Skillful Parenting course at the El Monte-Rosemead Adult School on October 8, 2019.  Asked how mother had done in the program, Ms. Gonzalez replied, "'She struggled a lot.  A lot, a lot.  I spent a lot of time with her.  Other students would come in and pick up the material and leave. [Mother] came and stayed there to work on the material with me. Her scores were low, so I would read it to her and explain things to her.  I think she struggled with the academic part.  She had a lot of re-doing to do.  Sometimes she lost a packet.  Sometimes she would write on the packets—you're not supposed to write on the packet.  She had trouble transferring her answers to the answer sheet, so I just told her to go ahead and write the answers on the packet.'"

The social worker asked Ms. Gonzalez if she had observed any mental health issues.  She responded, "'I know, I know.  Her mental health issues are obvious.'"

At the September 25, 2020, disposition hearing, mother told the juvenile court she could not help that her children had been taken, but she had focused on herself and her children.  She had done everything the court asked her to do—she had taken a parenting class, she went to therapy, and she was willing to follow the court's order concerning medication.

The juvenile court declared the child to be a dependent of the court and ordered that mother would not receive reunification services pursuant to section 361.5, subdivisions (b)(10) and (b)(11). It stated, "I appreciate some efforts that are being made by [mother]. I recognize that. I recognize that there are some efforts being made, but I also recognize the statements of the collaterals with regard to the current circumstance, the ongoing issues, and the fact that they have yet to be appropriately addressed."

## III.  DISCUSSION

A.  *Section 361.5, Subdivision (b)*

Mother contends the juvenile court did not expressly find that clear and convincing evidence supported bypass of reunification services under section 361.5, subdivisions (b)(10) and (b)(11) and substantial evidence did not support an implied bypass finding. Substantial evidence supported the court's implied finding.

### 1.  Standard of Review

"When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the

10

trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012.)

## 2. Analysis

"Reunification services must be provided to the mother and statutorily presumed father of children who have been removed from their parents' custody, unless a statutory exception applies. (. . . § 361.5, subd. (a).) The statutory exceptions are contained in subdivision (b) of section 361.5, which provides that '[r]eunification services need not be provided' if the court finds 'by clear and convincing evidence' that any of 17 enumerated bypass provisions apply. [Citation.]" (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1141.)

Under section 361.5, subdivision (b)(10), reunification services need not be provided when the juvenile court finds by clear and convincing evidence: "That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to [s]ection 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian."

11

Under section 361.5, subdivision (b)(11), reunification services need not be provided when the juvenile court finds by clear and convincing evidence: "That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed, and this parent is the same parent described in subdivision (a), and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent."

"[S]ection 361.5, subdivision (b)(10) has two prongs or requirements: (1) the parent previously failed to reunify with a sibling of the child; *and* (2) the parent failed to make reasonable efforts to correct the problem that led to the sibling being removed from the parent's custody." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 96.) Similarly, section 361.5, subdivision (b)(11) has two prongs: (1) parental rights were severed as to the child's sibling or half sibling; and (2) the parent failed to make reasonable efforts to correct the problem that led to removal of the sibling or half sibling from the parent's custody. (§ 361.5, subd. (b)(11).)

"The reasonable effort requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.] 'To be reasonable, the parent's efforts must be more than "lackadaisical or half-hearted."' [Citations.] However, '[t]he "reasonable effort to treat" standard "is not synonymous with 'cure.'"' [Citation.] [¶] We do not read the 'reasonable effort' language in the bypass provisions to mean that *any* effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable. It is certainly

12

appropriate for the juvenile court to consider the *duration, extent and context* of the parent's efforts, as well as any other factors relating to the *quality and quantity* of those efforts, when evaluating the effort for reasonableness. And while the degree of progress is not the *focus* of the inquiry, a parent's progress, or lack of progress, both in the short and long term, may be considered to the extent it bears on the *reasonableness* of the effort made. [¶] Simply stated, although success alone is not the sole measure of reasonableness, the *measure* of success achieved is properly considered a factor in the juvenile court's determination of whether an effort qualifies as reasonable." (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914–915 (*R.T.*)

Mother concedes the Department established the first prongs of section 361.5, subdivisions (d)(10) and (d)(11)—i.e., that the juvenile court previously terminated reunification services as to the child's half siblings and terminated mother's parental rights to them. She argues instead that the Department failed to establish the second prong—i.e., that she failed to make reasonable efforts to treat the problems that led to the removal of the half siblings. There was substantial evidence that mother did not make reasonable efforts to treat her mental and emotional problems.[3]

Mother's problems that led to the removal of the child's half siblings in 2017 included her mental and emotional problems,

---

[3]     Because we hold that substantial evidence supported the court's implicit finding that mother did not make reasonable efforts to treat the mental and emotional health problems that led to the removal of the half siblings, we do not address its implicit finding that mother did not make reasonable efforts to address her physical abuse of the half siblings.

13

failure to take her psychiatric medication as prescribed, and involuntarily hospitalizations for the evaluation and treatment of her psychiatric condition. As part of its disposition order, the juvenile court ordered the Department to provide mother with reunification services including individual counseling that addressed "'mother's lengthy and unresolved history of resistance to consistent mental health and psychiatric and therapeutic treatments[,]' . . . participating in current psychiatric treatment[,] and compliance with [a] prescribed psychotropic medication regimen."

The Department reported for the 12-month review hearing for the child's half siblings, on January 9, 2019, that mother had been referred to all court-ordered services, but had been unable to stabilize her mental health. Between March and May 2018, she had several psychiatric hospitalizations, had not complied with her mental health services, and refused to cooperate with her regional center services.

Some six months later, in June 2019, just after the child's birth, mother was placed on a section 5150 psychiatric hold after she displayed delusional and aggressive behavior at the hospital.

About six weeks later, at the end of July 2019, mother denied to a social worker that she had a history of mental and emotional problems, had been diagnosed with several mental health conditions, or had been hospitalized. She stated the allegations in the amended section 300 petition were "'[n]ot true. None of it. I have proof on paper. I have a doctor's note showing I don't need medication.'" She claimed her section 5150 psychiatric hospitalization after the child's birth had something to do with her mother disowning her and telling her to have the police take care of her.

14

A few weeks later, during an August 12, 2019, visit with the child, mother "appeared paranoid and seemed to be talking to people that were not there, and cussing and yelling at some imaginary people."

About four months later, on December 3, 2019, mother told the social worker that she was not attending individual therapy. Although mother claimed to be medication compliant, her prescription bottle was empty and she could not explain why.

As of February 5, 2020, two months later, mother was not case compliant. She had not started a new parenting class, was not attending individual therapy, and was not taking any medication.

In March 2020, the social worker scheduled two meetings with mother to check on her medications. Mother did not show up for either meeting.

As reported in the Department's September 17, 2020, Last Minute Information for the Court, mother denied to her new baby's caregiver that she had mental health problems and stated that she would not take any medication.

At the disposition hearing, the juvenile court admitted mother's medication records from Antelope Valley Mental Health Clinic that showed prescriptions from August 17, 2016, to December 31, 2018, and a record from the Los Angeles County Department of Mental Health that showed appointments for unspecified reasons from March 11, 2020, to August 18, 2020. Although that evidence indicated some past and recent efforts to address mother's mental and emotional problems, they were insufficient in the context of the other evidence presented to the juvenile court, to demonstrate reasonable efforts. (*R.T., supra*, 202 Cal.App.4th at pp. 914–915.)

15

B.      *Best Interest of the Child*

Mother contends that if we hold the juvenile court properly found she did not make reasonable efforts to address the problems that led to the removal of the child's half siblings, then the court abused its discretion in denying her reunification services as they were in the child's best interest.  We disagree.

1.      Standard of Review

""""A juvenile court has broad discretion when determining whether . . . reunification services would be in the best interests of the child under section 361.5, subdivision (c).  [Citation.]  An appellate court will reverse that determination only if the juvenile court abuses its discretion.""""  (*In re A.E., supra,* 38 Cal.App.5th at pp. 1140–1141.)

2.      Analysis

If a juvenile court finds that a parent is described by a bypass provision in section 361.5, subdivision (b), it "shall not order reunification for a parent . . . unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child."  (§ 361.5, subd. (c)(2).)  "Section 361.5, subdivision (c) enables a parent to obtain reunification services notwithstanding section 361.5[, subdivisions (b)(10) and (b)(11)] where the parent demonstrates reunification is in the child's best interest by offering evidence of, among other things, his or her current ability to parent.  To determine whether reunification is in the child's best interest, the court considers the parent's

current efforts, fitness, and history; the seriousness of the problem that led to the dependency; the strength of the parent-child and caretaker-child bonds; and the child's need for stability and continuity.  [Citation.]  A best interest finding requires a likelihood reunification services will succeed; in other words, 'some "reasonable basis to conclude" that reunification is possible . . . .' [Citation.]"  (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1116.)

The record does not contain substantial evidence that continued reunification services for mother were in the child's best interest.  As set forth above, mother has significant long-term mental and emotional problems which she has, at times, denied.  Consistent with her denials, mother has a continuing history of failing to take prescribed medications.  The record does not suggest a "current ability to parent" or "a likelihood reunification services will succeed." (*In re Allison J., supra*, 190 Cal.App.4th at p. 1116.)  Accordingly, the juvenile court's implicit finding that continued reunification services for mother were not in the child's best interest was not an abuse of discretion.  (*In re A.E., supra*, 38 Cal.App.5th at pp. 1140–1141.)

17

## IV.    DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS


                                        KIM, J.


We concur:



        RUBIN, P. J.



        MOOR, J.


18